No. 101,204

STATE OF KANSAS, *Appellee*, v. DAVID A. HOLMAN, *Appellant*.

(284 P.3d 251)

 Opinion filed
August 24, 2012. 

*Randall L. Hodgkinson*, of Kansas Appellate Defender Office, argued the cause and was on the briefs for appellant.

*Lesley A. Isherwood*, assistant district attorney, argued the cause, and *Nola Tedesco Foulston*, district attorney, and *Steve Six*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

BUSER, J.: David A. Holman was convicted by a jury of three counts of aggravated indecent liberties with a child in violation of K.S.A. 21-3504(a)(3)(A). This is a direct appeal of those convictions and the sentences imposed by the district court. This court has jurisdiction over Holman's appeal under K.S.A. 22-3601(b)(1).

Holman raises several errors regarding the district court's rulings on evidentiary matters at trial. In particular, he contends the trial court erred in the admission of evidence under K.S.A. 60-455 involving an uncharged sexual offense he allegedly committed against the complaining witness. On the other hand, he complains of the trial court's refusal to admit evidence of the prior sexual conduct of the complaining witness under the Kansas rape shield statute, K.S.A. 21-3525, and evidence of the prior sexual conduct of her sister. Holman also contends the trial court impermissibly limited his cross-examination of the complaining witness in violation of the Confrontation Clause of the Sixth Amendment to the Constitution of the United States. With regard to Count II of the second amended information, Holman claims the trial court's granting of the State's motion to expand the time frame of the offense at the conclusion of the defense case was reversible error. With regard to Counts IV and V, Holman contends his convictions violate the Double Jeopardy Clauses of the Fifth Amendment to the Constitution of the United States and § 10 of the Kansas Constitution Bill of Rights because they subject him to multiple punishments for the same offense. Finally, Holman raises two related claims of error regarding his enhanced sentencing in Counts IV and V ac-

cording to K.S.A. 21-3504(c) and K.S.A. 21-4643(a)(1)(C) (Jessica's Law).

Upon our review of these issues, we conclude Holman has not shown reversible error in the trial court's rulings regarding the evidentiary matters, limitation of cross-examination, or amendment of the charging document. We determine, however, that Holman has shown a violation of his constitutional right prohibiting multiple punishments for the same offense. As a result, we affirm the conviction in Count IV but reverse the conviction in Count V and vacate that sentence. Finally, the enhanced off-grid sentence imposed in Count IV is vacated and the case is remanded with directions to resentence Holman in accordance with the Kansas Sentencing Guidelines Act (KSGA) nondrug grid box for his conviction on that count.

## FACTUAL AND PROCEDURAL BACKGROUND

Holman's three convictions of aggravated indecent liberties with a child relate to his illicit sexual conduct with a young girl, T.M.A. Holman was the stepfather of T.M.A., who was born in November 1997. At the time of trial, she was 10 years old and had just completed the fourth grade in school.

At trial, T.M.A. described three sexual encounters involving Holman, which resulted in the State filing five criminal charges. According to T.M.A., the first time she was molested was in the spring of 2006. At that time, Holman, T.M.A. and her older sister, A.A., were seated on a couch in the living room of their home. Holman placed his hand underneath T.M.A.'s jeans and underpants and moved his fingers back and forth and inside her vagina. According to T.M.A., "It hurt." T.M.A. said she did not tell anyone about the touching because she was scared. This incident was charged in Count I as rape, in violation of K.S.A. 21-3502(a)(2). In the alternative, Holman was charged in Count II with aggravated indecent liberties with a child in violation of K.S.A. 21-3504(a)(3)(A).

Another incident occurred sometime after May 2006. T.M.A. testified that Holman led her downstairs to the laundry room where he laid her down on a blanket while both were clothed. T.M.A.

related that while Holman was on her leg, he "moved up and down" on her in a humping motion. During this time Holman told her, "I'm a bad boy, and you're a bad girl." This incident resulted in the State charging Holman in Count III with aggravated indecent liberties.

A final incident took place during the spring of 2007 when some family members were watching the movie "Saw" in the living room of their home. As related by T.M.A., during the movie Holman "put a blanket over his hand and then put it inside my pants." At some point, T.M.A. also testified that Holman "took my hand and put my hand inside of his pants." Holman then had T.M.A. move her fingers back and forth on his penis. A.A., who was born in March 1995 and was 13 years old at the time of trial, testified that she observed Holman and T.M.A. and "he had his hand in her pants, and she had hers in his." Based on this incident, Holman was charged in Counts IV and V with aggravated indecent liberties.

A few days after the last incident, during the late evening, A.A. spoke privately with T.M.A. and asked her, "[T.M.A.], what was David doing to you on the couch when you guys were sitting next to each other?" According to A.A., T.M.A. "just kind of sighed" and moved her fingers back and forth. T.M.A. then related to A.A. some of the incidents involving illicit sexual acts perpetrated by Holman upon T.M.A. T.M.A. asked A.A. not to tell anyone, but A.A. insisted that their maternal grandmother be told at once. According to A.A.,

"we told my grandma, we have something important to tell her about Dave, and then . . . I basically told her everything [T.M.A.] told me, and . . . she was kind of just speechless and then, like, shocked, and I don't think she could believe it, but then she was asking [T.M.A.] if it was true. [T.M.A.] nodded and said, 'Yes.' "

The girls' grandmother testified that "[A.A.] came in and said that [T.M.A.] needed to talk to me, only [T.M.A.] wouldn't talk." Their grandmother related that both girls had a "very serious" demeanor and T.M.A. was crying. After awhile, T.M.A. "started opening up" and told her grandmother about some of the incidents.

The next morning, May 2, 2007, T.M.A., A.A., and their grandmother spoke to the girls' mother, K.A. According to K.A., "My

mother said that she . . . and the girls had something they wanted to tell me, and I looked at the girls, and [T.M.A.] started crying, and she . . . said, "Mama, Dave's been touching me." K.A. testified, "I was not believing what I was hearing, you know, so I wanted her to be sure." T.M.A. related the incidents to her mother.

Shortly thereafter, K.A. called Holman at work and "told him that he needed to talk to me, because I was about to call the police." According to K.A.,

"[Holman] said, 'What's going on?' I said, 'Why don't you tell me what's going on.' And I told him the girls had just come to me, and he got kind of quiet and he sounded nervous and asked if they were upset about some chores or something. And I said, 'No.' And I asked him about some things [T.M.A.] had said and about the hand in the pants, and his reply was that he fell asleep on the couch that night, and he woke up with her hand in his pants."

In response, K.A. told Holman that it was "because [of] people like him [that] the world is such a horrible place, and [she] hung up on him." K.A. promptly dialed 911 to report the incidents, and the police arrived shortly thereafter.

After the phone call from K.A., Holman left work early that day and did not return home. The following day, while driving, K.A. saw Holman walking down the street 1 or 2 blocks from their home. Upon seeing her, Holman started to run but then he stopped and lit a cigarette. K.A. called the police from her cell phone. According to her, Holman "looked at me, and he said that he could never tell me how sorry he was" and "that nothing happened that he initiated." Lastly, Holman asked K.A. to "drive away before [the police] arrested him, so that our son wouldn't see him be arrested."

Shortly after his arrest, Holman was interviewed by Detective Don Story. Prior to the recorded interview, Holman was advised of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694, *reh. denied* 385 U.S. 890 (1966), and he signed a written waiver of rights. Holman told the detective:

"There was times when, you know I'd be sitting there and [T.M.A.'s] hand [would] end up in my lap and I'd get up and go to the bathroom. I fell asleep and her hand, I'd wake up, her hand would be in my lap and, you know, sometimes you'd fall asleep with her hand in your lap, well you'd get aroused in your sleep, men do.

. . . .

". . . And, you know, it seemed to transpire a lot.

". . . I never reprimanded her for being curious about stuff. And that's all I ever thought it was . . . you know, a kid's curiosity about stuff."

Holman confirmed that when the family was watching the movie "Saw," he "woke up and [T.M.A.] was touching me."

Before concluding the interview, Holman stated, "I have done wrong things. I do not know why I've done wrong things. . . . I totally would like to shoot myself in the head . . . . I'm not guilty of everything, I'm not innocent of everything. That's all I can say."

The jury found Holman guilty of the alternative Count II of aggravated indecent liberties for the first incident that occurred on the living room couch but acquitted him of Count I of rape. He was also found guilty of Counts IV and V of aggravated indecent liberties for the last incident that occurred while the family was watching the movie "Saw." The jury acquitted Holman of any criminal wrongdoing involving Count III for the incident in the laundry room.

With regard to Counts IV and V, Holman was sentenced to two concurrent life sentences, with a mandatory minimum term of 25 years' imprisonment under K.S.A. 21-3504(c) and K.S.A. 21-4643(a)(1)(C) (Jessica's Law). The district court also imposed a concurrent 59-month sentence for Count II. This aggravated indecent liberties count was not charged as a Jessica's Law offense because it was committed prior to the effective date of K.S.A. 21-4643. Holman filed a timely appeal.

### ADMISSION OF K.S.A. 60-455 EVIDENCE AND FAILURE TO PROVIDE A LIMITING INSTRUCTION

Prior to trial, the State filed a motion to admit evidence under K.S.A. 60-455 regarding an uncharged incident that occurred in T.M.A.'s bedroom sometime from the spring of 2006 through the spring of 2007. This incident was revealed by T.M.A. following therapy in September 2007. According to T.M.A., she was lying on her bed when Holman removed her pants and underwear and began to perform oral sex upon her.

At the pretrial hearing, Holman's counsel objected to the State's motion because

"it essentially places another allegation here that we're going to have to try to rebut. If the State wanted to charge him with it, they've had ample opportunity to do that, and they have chosen not to. So it seems to me that it's a confrontation issue, as well as a due process issue, to allow them to go into it during the jury trial."

After argument, the district court ruled that the evidence was relevant and material and that its probative value outweighed its prejudicial effect. In particular, the district court ruled that the evidence was admissible for the limited purposes of proving intent, plan, preparation, lack of mistake or accident, continuing course of conduct, and the relationship of the parties.

Although the State had proposed the wording for a limiting instruction in its motion, the State was directed "to draft a limiting instruction in conformity with the Court's order." No limiting instruction, however, was ever submitted to the jury. Of note, Holman never contemporaneously objected at trial to the admission of the K.S.A. 60-455 evidence, submitted his own proposed limiting instruction, or objected to the trial court's failure to provide the limiting instruction to the jury.

On appeal, Holman does not brief the principal argument he raised in the district court that his rights to confront witnesses and due process would be violated by the admission of the uncharged crime. An issue not briefed by the appellant is deemed waived and abandoned. *State v. McCaslin*, 291 Kan. 697, 709, 245 P.3d 1030 (2011).

Instead, Holman presents two arguments on appeal. First, he contends the trial court erred by admitting the K.S.A. 60-455 evidence at trial for the limited purposes proffered by the State. The State counters that this issue was not preserved for appeal, because Holman did not contemporaneously object to the introduction of the evidence at trial. Holman does not refute the State's assertion that he did not contemporaneously object at trial, but he claims his pretrial objection was sufficient to preserve the issue for this court's review. The record is clear that while Holman made a pre-

trial objection to the questioned K.S.A. 60-455 evidence, he did not object to its admission at trial.

K.S.A. 60-404 provides:

"A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless there appears of record objection to the evidence timely interposed and so stated as to make clear the specific ground of objection."

The contemporaneous objection rule, as codified by this statute, "prevents appellate review of evidentiary issues unless there was a timely and specific objection at trial." *State v. Dukes*, 290 Kan. 485, 488, 231 P.3d 558 (2010); see also *State v. King*, 288 Kan. 333, 349, 204 P.3d 585 (2009) ("We stress today the importance of this legislative mandate. K.S.A. 60-404 dictates that evidentiary errors shall not be reviewed on appeal unless a party has lodged a timely and specific objection to the alleged error at trial.").

As this court has stated, " '[t]he purpose of the rule requiring a timely and specific objection is to give " 'the trial court the opportunity to conduct the trial without using the tainted evidence, and thus avoid possible reversal and a new trial.' " ' [Citations omitted.]" *King*, 288 Kan. at 342. The rationale for the rule is that a trial court is not in position to fully consider whether to admit the evidence until the evidence is offered at trial because the " '[m]ateriality of the proposed evidence may not become actually apparent until other evidence has been admitted.' " *State v. Jones*, 267 Kan. 627, 638, 984 P.2d 132 (1999) (quoting *State v. Nunn*, 244 Kan. 207, 213, 768 P.2d 268 [1989]).

In the present case, Holman objected to the K.S.A. 60-455 evidence prior to trial but neglected to renew that objection during trial. A similar circumstance was presented in *State v. Berriozabal*, 291 Kan. 568, 580, 243 P.3d 352 (2010). *Berriozabal* involved a defendant engaging in illicit sexual behavior with a young girl who lived in a residence with the defendant and the girl's mother. Prior to trial, the State filed a motion under K.S.A. 60-455 to admit evidence of Berriozabal's prior uncharged sexual conduct with the girl. At the pretrial evidentiary hearing, Berriozabal objected to the prior crimes evidence. The district court granted the motion, how-

ever, and ruled the evidence was admissible for limited purposes. When the K.S.A. 60-455 evidence was offered at trial, Berriozabal did not renew his pretrial objection to its admission.

In declining to review Berriozabal's claim on appeal that admission of the prior crimes evidence violated K.S.A. 60-455, this court reiterated: "K.S.A. 60-404 requires a 'timely' and specific objection to the admission of evidence, which this court has held means that a pretrial objection must be contemporaneously renewed during trial or preserved through a standing objection. [Citations omitted.]" *Berriozabal*, 291 Kan. at 580; see *State v. Riojas*, 288 Kan. 379, 385, 204 P.3d 578 (2009); *State v. Carapezza*, 286 Kan. 992, 1002, 191 P.3d 256 (2008); *State v. Francis*, 282 Kan. 120, 138, 145 P.3d 48 (2006).

We conclude that Holman's failure to specifically and contemporaneously object at trial to the admission of the uncharged crime evidence offered under K.S.A. 60-455 precludes appellate review.

On a related issue, Holman contends the trial court's failure to provide the jury with a limiting instruction indicating the limited purposes for which the jury could consider the K.S.A. 60-455 evidence constitutes reversible error. The State does not respond to this argument.

At the outset, it is uncontroverted that the district court directed the State to prepare a limiting instruction in accordance with the court's ruling admitting the evidence. The State's pretrial motion, however, included a proposed limiting instruction:

"Evidence has been admitted tending to prove that the defendant committed crimes or acts other than the present crimes charged. This evidence may be considered solely for the purpose of proving the defendant's intent, plan, preparation and lack of mistake or accident.

"This evidence may also be considered for the purpose of proving the relationship of the parties and the existence of a continuing course of conduct with T.M.A."

The State's proposed trial instructions, however, did not include this limiting instruction.

On appeal, Holman candidly concedes he "did not include a limiting instruction in his requested instructions . . . or make a separate request for a limiting instruction at the instructions con-

ference." The record also shows that Holman did not object to the trial court's failure to provide the jury with a limiting instruction during the trial. Finally, although Holman did not preserve his objection to the admission of the K.S.A. 60-455 evidence, the State does not argue that this failure precludes our consideration of the related instructional issue on appeal. As a result, we will consider the merits of the instructional issue employing traditional analysis.

Generally, appellate courts may review the propriety of a trial court's failure to provide a jury instruction in cases where the defendant failed to object at trial: "If a defendant did not request the district court to give a particular jury instruction and did not object to its omission from the court's instructions, the defendant's claim of error for the failure to give the challenged instruction is reviewed under the clearly erroneous standard." *State v. Cook*, 286 Kan. 1098, Syl. ¶ 4, 191 P.3d 294 (2008); see K.S.A. 22-3414(3). Moreover, as in the present case, "[t]he defendant's burden to request an instruction or object to its omission is not satisfied by the State having initially proposed the instruction to the court." *Cook*, 286 Kan. 1098, Syl. ¶ 4.

Accordingly, because Holman failed to object to the lack of a limiting instruction that was originally proposed only by the State, this court will review the issue employing the clearly erroneous standard. *State v. Brown*, 291 Kan. 646, 654, 244 P.3d 267 (2011); *State v. Reid*, 286 Kan. 494, 513, 186 P.3d 713 (2008). That standard provides: " 'Instructions are clearly erroneous if there is a real possibility the jury would have rendered a different verdict had the instruction error not occurred.' " *Brown*, 291 Kan. at 654.

Evidence introduced pursuant to K.S.A. 60-455 requires a limiting instruction. See *State v. Gunby*, 282 Kan. 39, 58-59, 144 P.3d 647 (2006). As a result, the district court's failure to provide the jury with a limiting instruction in this case constitutes error. 282 Kan. at 58. Next, we consider whether this error was clearly erroneous based on the evidence presented at trial.

Upon a careful review of the record, we are not convinced there is a real possibility the jury would have rendered a different verdict if it had been given a limiting instruction. Several factors persuade us that the trial court's omission was not clearly erroneous.

First, the jury's acquittal of Holman for rape in the first incident and for aggravated indecent liberties in the laundry room incident shows the jury did not exaggerate the importance of the K.S.A. 60-455 evidence and improperly conclude that " ' "because the defendant has committed a similar crime before, it might properly be inferred that he committed this one" ' " or " ' "that the defendant deserves punishment because he is a general wrongdoer even if the prosecution has not established guilt beyond a reasonable doubt in the [case] at hand." ' " *Gunby*, 282 Kan. at 48-49 (quoting *State v. Davis*, 213 Kan. 54, 58, 515 P.2d 802 [1973]). If the jury had considered the K.S.A. 60-455 evidence as proof of Holman's propensity to engage in illicit sexual behavior, one would expect that Holman would have been convicted of all the crimes charged.

Second, the K.S.A. 60-455 evidence was merely one more allegation by T.M.A., similar to other allegations she made, that were charged in the second amended information. The allegation involving the uncharged crime—similar to the other charges—was proven based on the testimony of the same child whose credibility was at issue throughout the trial. As a result, any potential prejudice from the uncharged crime and lack of a limiting instruction was tempered because T.M.A. (and not another young victim, for example) was the source of the K.S.A. 60-455 evidence.

Third, during closing argument, Holman used the uncharged crime as a focal point to attack T.M.A.'s credibility regarding the charged offenses. In particular, Holman emphasized that T.M.A.'s claim about "oral sex" was not mentioned during her interview with Detective Story or during therapy, and she previously had never mentioned any sexual impropriety that occurred in her bedroom. As a result, Holman claimed T.M.A.'s claim of oral sex was "created . . . [and] doesn't make any sense. . . . These are problems. These are terrible problems with this case." In short, Holman was able to use the K.S.A. 60-455 evidence as a means to undermine T.M.A.'s credibility and bolster his defense that T.M.A. lied about all of her molestation allegations.

Finally, given the substantial direct and circumstantial evidence of Holman's guilt—apart from the K.S.A. 60-455 evidence admitted without the limiting instruction—we are unable to say " 'there

is a real possibility the jury would have rendered a different verdict had the instruction error not occurred." See *Brown*, 291 Kan. at 654.

T.M.A.'s trial testimony was fairly consistent with her pretrial accounts provided to her family and Detective Story. In particular, the lewd conduct during the movie night incident was corroborated by A.A. and, in part, by Holman himself. Holman's admissions related by his wife ("he could never tell me how sorry he was" and "nothing happened that he initiated") coupled with his concessions to Detective Story ("I have done wrong things. I do not know why I've done wrong things. . . . I totally would like to shoot myself in the head . . . .") indicated Holman's knowledge of guilt and expression of remorse regarding the allegations that he molested T.M.A. Finally, Holman's disappearance from work and failure to return home upon being confronted with the molestation accusations was hardly exculpatory.

For all of these reasons, the trial court's error in failing to provide the jury with a limiting instruction regarding the K.S.A. 60-455 evidence was not clearly erroneous.

## The State's Motion in Limine

On appeal, Holman contends the trial court erred by sustaining the State's motion in limine to prohibit evidence relating to A.A.'s molestation by T.M.A.'s biological father when she was 3 years old. In particular, Holman asserts that as a result of her molestation experience, A.A. had both the motive and means to encourage T.M.A. to falsely accuse Holman of molestation so A.A. "would be removed from Mr. Holman's home and [be] placed with her biological father." According to Holman, A.A.'s molestation "was integral to the theory of the defense."

Prior to trial, the State made an oral motion "to prohibit the defense from introducing any evidence that [A.A.] was sexually molested or that [A.A.] molested [T.M.A.] or that some third party has molested this child as evidence in this current trial." The State argued the evidence was irrelevant to show any improper motive on the part of A.A. and T.M.A. to falsely accuse Holman of the molestations. In particular, the State asserted there was no link

between A.A.'s molestation when she was 3 years old and the inference that, as a result of that experience, 7 or 8 years later A.A. told T.M.A. in the present case to "create this law enforcement chaos for th[e] defendant."

In response, defense counsel clarified with regard to the charged offenses that "we are not going to claim that [T.M.A.] was victimized by somebody else." Defense counsel argued the evidence was relevant, however, as a "basis for where [T.M.A.] obtained the knowledge regarding details of the sexual abuse, and it's relevant as far as the motivation of the parties that are making the allegations." Holman's counsel asserted that because A.A. had independent knowledge of sexual abuse, she was able to "[pass] that information to [T.M.A.] and, as the older sister, manipulat[e] [T.M.A.] into making . . . false allegations." Defense counsel also claimed this evidence showed that T.M.A. could have learned sexual terms from A.A. instead of Holman.

After extended argument, the district court ruled, "As far as [A.A.] being allegedly sexually molested in the past, the Court finds that not to be relevant. As far as [A.A.] or anyone else talking to [T.M.A.] about sex or sexual activity, just in general, Court finds that irrelevant."

After the district court ruled, Holman's counsel advised that "the defense has no other choice but to proffer what our defense is" because the court's ruling "is denying the defense the ability to present a defense in this case." Holman's counsel then disclosed the defense: That A.A., "from her own statements, is not particularly fond of David Holman. . . . She did not like Mr. Holman." Defense counsel explained:

"As far as motivation for fabrication of allegations, the fact that [A.A.] has independent knowledge of what can happen in a household . . . when allegations are made, the fact that she has a history and knows, unfortunately, what is involved in a molestation and putting that information to [T.M.A.] and, as the older sister, manipulating [T.M.A.] into making these false allegations, that is why we're here."

The district judge responded:

"I think you misunderstood what I said. I mean, you're free to—to ask [T.M.A.] if she's had discussions with other people about any touching, any sexual contact with your client. And obviously, if she says yes, then you can follow up with, who

did you speak to, and where did that take place, and what was said, you know, if [T.M.A.] says, yeah, I talked to [A.A.] about it, and this is what [A.A.] told me, she said, let's call the police and that'll get your client, Mr. Holman, that'll get him in trouble, and we can get him out of the house, so on and so forth, that's all admissible."

The district court also ruled on the admissibility of evidence regarding T.M.A.'s knowledge of sexual terms:

"[Y]ou're free to ask [T.M.A.] about the terminology she uses regarding any sexual references. If she uses the word humping, you're free to ask her, you know, where did she learn that word, who told her that, because obviously . . . at the time that this allegedly happened she was an eight-year-old . . . [and] if she used that term in any statements she made to law enforcement, then obviously, you're entitled to ask her, you know, where did you learn that word. . . . [Y]ou're free to do that."

Defense counsel protested, "But the defense is not being allowed to explore the credibility of the only two eyewitnesses to this information." That comment prompted the following colloquy:

"THE COURT: You can attack their credibility all you want . . . . The Court will give you latitude when [T.M.A.] and [A.A.] are on the stand to attack their credibility. You can go forward with the vigorous [c]ross-[e]xamination.

"[DEFENSE COUNSEL]: Except we are not going to be allowed, apparently, to go into an explanation, something that can be proven and—proven source of the knowledge that [T.M.A.] has, because it is undisputed that [A.A.] was, in fact, molested. [A.A.] does, in fact, have knowledge, based on her own horrific experience, that—that is concrete. That's not an inference. That's not a supposition. But we can't explore it.

"THE COURT: *Well, you may or may not be able to explore that, depending on how you go forward with your questioning, how you couch the questions.* Because as I said earlier, when both of these young children are on the stand, you can question them as to whether or not they had conversations about any sexual contact taking place between your client, [T.M.A.], and about the vocabulary that was used by [T.M.A.] in describing the sexual contact." (Emphasis added.)

This court recently articulated the standard used by appellate courts when reviewing the propriety of the admission or exclusion of evidence:

"First, the court determines relevance, which has two components, materiality and probativeness. Materiality concerns whether the fact to be proved ' "has a legitimate and effective bearing on the decision of the case.' " [Citations omitted.] Our standard of review for materiality is de novo. [Citation omitted.] On probativeness, the court examines whether the offered evidence has ' "any tendency in

reason to prove" ' a disputed material fact. [Citation omitted.] This court reviews probativity for abuse of discretion. [Citation omitted.]

" ' " 'Once relevance is established, evidentiary rules governing admission and exclusion may be applied either as a matter of law or in the exercise of the district judge's discretion, depending on the contours of the rule in question. [Citation omitted.] When the adequacy of the legal basis of a district judge's decision on admission or exclusion of evidence is questioned, we review the decision de novo.' " ' [Citations omitted.]" *State v. Magallanez*, 290 Kan. 906, 920-21, 235 P.3d 460 (2010).

See *State v. Shadden*, 290 Kan. 803, Syl. ¶ 4, 235 P.3d 436 (2010); *Riojas*, 288 Kan. at 383.

In analyzing the relevance of the challenged evidence, we first consider Holman's theory of defense. Quite simply, Holman denied all of the charges. Moreover, in an effort to defend against the State's allegations, he sought to undermine the credibility of T.M.A. and A.A.

With regard to T.M.A., Holman's counsel accused the young girl of lying. He repeatedly focused on claimed inconsistencies and incongruities involving the dates and details of the molestations as disclosed by T.M.A. in out-of-court statements, the preliminary hearing, and during trial. Holman's counsel, in closing argument, told the jury that inconsistent versions of the alleged crimes occurred "because lies are hard to remember."

With regard to A.A., defense counsel suggested that she procured T.M.A. to lie about the molestations. This theory was subtly presented in opening statement:

"So we have to get to the motivations of why this case has come to light. We have [A.A.]. She's a 12-year-old whose father lives in Pratt, discussed her already a little bit and the fact that she would like to move to Pratt to be with her father more. . . . [A]t the time these allegations come to light . . . [she] is scheduled to go to Pratt and spend the summer with her father. [A.A.] doesn't like the tension in the house between her and [Holman], based on the fact that she now has to do chores, she now is responsible for everything else, the fact that she now is being disciplined by somebody, and the fact that [Holman] is not her real dad. [A.A.] has the motivation. It's really—just depends on how far [A.A.] is willing to go just to see if she can maybe move in with her real dad and see how that works out."

At trial, primarily through cross-examination of A.A., Holman established that A.A. did not get along with Holman and they oc-

casionally argued about "[c]hores, school, just normal things." It was also shown that after T.M.A. reported the molestations, A.A. lived with her biological father in Pratt for slightly more than a year.

In sum, as intimated in opening statement and cursorily developed in cross-examination, Holman implied that A.A. orchestrated T.M.A.'s false accusations because A.A. did not get along with Holman and she wanted to leave his home in order to live with her father in Pratt. On appeal, Holman claims the trial court's refusal to allow evidence that A.A. was molested prevented him from presenting this defense.

It is well established:

"A defendant is entitled to present his or her theory of defense. The exclusion of relevant, admissible, and noncumulative evidence, which is an integral part of the theory of defense, violates the defendant's fundamental right to a fair trial. However, the defendant's right to present a defense is limited by the statutory rules of evidence and the case law interpreting those rules." *State v. Gaither*, 283 Kan. 671, Syl. ¶ 8, 156 P.3d 602 (2007).

There may have been a myriad of reasons why A.A. had ill will towards Holman and, as a result, incited T.M.A. to make false allegations against him in order to have a basis to leave Holman's residence to live with her father. The trial court allowed Holman to fully develop this relevant evidence at trial, and its proof was potentially important to establish A.A.'s motivation and impeach her credibility.

Was the fact of A.A.'s previous molestation, however, material and probative to the case generally and, in particular, to Holman's defense? The trial court determined this fact was not relevant to the issues in the case. We agree.

The fact that A.A. was molested by T.M.A.'s biological father 8 years prior to T.M.A.'s accusations against Holman had no legitimate bearing on any issue in this case. Moreover, just because A.A. was sexually victimized as a toddler did not tend to prove she had any reason as a teenager to encourage T.M.A. to fabricate the allegations against Holman. A.A.'s molestation also had no bearing on her credibility, because there was no proffer that A.A. fabricated her own molestation or lied about it. In short, Holman has failed

to show the relevance of how A.A.'s molestation created an inference that she encouraged T.M.A. to make false accusations against Holman.

Moreover, in granting the State's motion in limine, the trial court clarified that it was not limiting Holman's inquiry into those issues material and probative to his defense. In particular, the trial court allowed Holman to make inquiries regarding whether A.A. had induced T.M.A. to falsely accuse Holman. Holman was also permitted to inquire into the terminology T.M.A. used regarding any sexual references. The trial court also emphasized that defense counsel could engage in "vigorous [c]ross-[e]xamination" of both A.A. and T.M.A. in order "to attack their credibility." In this way, the trial court afforded Holman the opportunity to develop his defense.

Finally, Holman's protest that the suppression of evidence regarding A.A.'s molestation impaired his defense is overstated, given that Holman failed at trial to make basic inquiries to establish the foundation for this defense. Our review of the record shows that defense counsel never asked either girl if A.A. told T.M.A. to lie about the molestations. Neither girl was questioned about whether A.A. ever informed T.M.A. about her use and understanding of sexual terminology. No questions were posed to the girls about whether A.A. had ever lied or attempted to get Holman in trouble in order to precipitate her return to her father in Pratt. Yet, the district court specifically advised defense counsel that these areas of inquiry were appropriate. Finally, the district court left open the possibility of reconsidering its ruling based upon the girls' responses to these foundational questions that were never asked.

At the conclusion of trial, defense counsel acknowledged the paucity of evidence to support the notion that A.A. had influenced T.M.A. to lie about the molestations: "We're guessing when we say it's 'cause [A.A.] wanted to go to her father's house, I mean, just so happens she did, she spent the next year at her father's house. But, we don't know . . . . I don't know. We're guessing." Given the record, defense counsel's concession was appropriate. The failure of defense counsel to establish this theory of defense, however, was

not attributable to the district court's ruling on the State's motion in limine.

Evidence of A.A.'s molestation was not material or probative of any disputed material fact. Moreover, although the trial court afforded Holman ample opportunity to develop evidence in support of his defense, a fair appraisal of the trial evidence shows a scant evidentiary basis for it. The trial court did not err in its exclusion of evidence that A.A. had been molested as a child.

### THE DEFENDANT'S MOTION TO ADMIT T.M.A.'S PRIOR SEXUAL CONDUCT

On appeal, Holman claims the trial court erred in denying the admission of prior sexual conduct of T.M.A. pursuant to the Kansas rape shield statute, K.S.A. 21-3525. Holman argues that in addition to his defense that A.A. manipulated T.M.A. to falsely accuse Holman of the molestations, he also claimed "that T.M.A. acted out in sexually inappropriate ways." The State counters that "[w]hether T.M.A. acted out previously with a little boy, in a sexually charged fashion or whether she engaged in vaginal touching with A.A. cannot be said to be an 'integral' part" of a defense theory that focused on alleging A.A. manipulated T.M.A. into making false allegations against Holman so A.A. could reside with her biological father.

On the second day of trial, Holman presented the trial court with "Defendant's Motion for Admission of Evidence of Prior Sexual Experience and/or Conduct of the Victim/Complaining Witness, T.M.A. Pursuant to K.S.A. 21-3525." The motion requested an in camera hearing and "a finding by the Court that all of the evidence outlined in the attached supporting affidavit is relevant and admissible." The affidavit was signed by defense counsel.

The affidavit stated: "T.M.A.'s father had sexually abused [A.A.] when she was [3] years old. This information was learned when [A.A]. was about 7 years old." This evidence had previously been addressed by the trial court in ruling on the State's motion in limine. Additionally, the proffer of evidence stated:

"7. . . . [J.B.], his wife [N.B.], and minor son [C.B.] were at one time good friends of Defendant's family. During the Spring of 2005, when [T.M.A.]

was 6-7 years old, [J.B.] walked in on [T.M.A]. and his minor son (also about 6-7 years of age) acting out sexually inappropriately with each other.

"8. . . . The Holmans approached [T.M.A.] to ask her questions about where she learned this conduct. At that time, [A.A.] asked to speak to Mrs. Holman. [A.A.] disclosed that she had been inappropriately touching [T.M.A.]'s vaginal area as well as having [T.M.A.] touch hers. Additional incidents of genital contact over the clothing were disclosed to Mrs. Holman by [A.A.]

"9. Mrs. Holman related this information to Defendant. Together they questioned [T.M.A.] who confirmed what [A.A.] said."

In support of his motion, Holman cited to *State v. Bourassa*, 28 Kan. App. 2d 161, 15 P.3d 835 (1999), *rev. denied* 269 Kan. 934 (2000), for the proposition that the proffered evidence was admissible to "demonstrate that someone else besides the accused is the true source of the complainant's knowledge about sex." In overruling the motion, the trial court analyzed the *Bourassa* opinion:

"The defendant in *Bourassa* argued the [trial] Court committed error by refusing to allow introduction of the child's previous sexual history. *Bourassa*'s theory of defense was that the girl's father [rather than the defendant] could have molested her the morning of the alleged incident. The [appellate] Court in *Bourassa* concluded . . . the [trial] Court erroneously excluded the evidence.

"The [appellate] Court pointed out that the child was with her father on the morning of the alleged incident. Also, the child had made prior allegations of sexual abuse at the hands of her father.

"This present case is distinguishable from the *Bourassa* case. The defense in this case is not arguing that someone else molested the child. In the Court's opinion, the rape shield statute K.S.A. 21-3525 prohibits the defense from presenting evidence of the child's alleged prior sexual activity. The Court will not allow it."

Subsequent to the ruling, the State commented that one of the "bothersome things" with Holman's motion was "the lateness in the filing of [the] motion. It is required to be filed much [more] in advance of trial than it was in this case." In fact, K.S.A. 21-3525(b) provides that such a motion "must be made at least seven days before the commencement of the proceeding unless that requirement is waived by the court." On appeal, however, the State does not argue that Holman is procedurally barred from raising this issue for review. As a result, we will not consider the argument.

See *State v. McCaslin*, 291 Kan. 697, 709, 245 P.3d 1030 (2011) (An issue not briefed is deemed waived and abandoned.).

Our standard of review regarding this issue is similar to the general standard for review of the admission of evidence discussed earlier. With particular regard to the Kansas rape shield statute, however, this court has stated:

> "Relevancy, in addition to being the focus of general considerations regarding the admission of evidence, is the key consideration when applying the rape shield statute, K.S.A. 21-3525(b), which prohibits the admission of evidence of a rape victim's previous sexual conduct with any person, including the defendant, unless the district court first determines the evidence to be relevant and otherwise admissible. . . . The court has cautioned, however, that 'the legislature sent a clear message to the courts that a rape victim's prior sexual activity is generally inadmissible since prior sexual activity, even with the accused, does not of itself imply consent to the act complained of.' [Citation omitted.]" *State v. Berriozabal*, 291 Kan. 568, 586, 243 P.3d 352 (2010).

At the outset, Holman's affidavit did not describe the inappropriate sexual activity that allegedly occurred between T.M.A. and C.B. 1 year prior to the first reported instance of T.M.A.'s molestations. As a result, the trial court was left to speculate regarding the nature and extent of this behavior between two young children. Moreover, Holman did not show how this evidence was relevant to the case generally and, in particular, to proof of his defense. Whether T.M.A. and a young boy were sexually inappropriate had no bearing on Holman's defense that A.A. induced T.M.A. to lie about the molestations. Similarly, the claimed sexual touching between A.A. and T.M.A. did not tend to prove that A.A. perpetrated a scheme to encourage T.M.A. to falsely accuse Holman of the molestations.

On appeal, Holman suggests that in addition to his defense that A.A. concocted a scheme to falsely accuse Holman, his alternative defense theory was "that T.M.A. acted out in sexually inappropriate ways." Holman does not explain how T.M.A.'s prior acting out sexually is a defense to the charges that Holman engaged in aggravated indecent liberties with a child. He also cites no caselaw in support of his legal proposition.

With regard to the Kansas rape shield statute, "[i]n the past, this court has concluded that prior sexual conduct evidence may be material if it is relevant to issues such as the identity of the rapist, consent of the complaining witness, or whether the defendant actually had intercourse with the complaining witness." *Berriozabal*, 291 Kan. at 586. In the present case, the identity of the offender was not at issue, and T.M.A.'s consent was legally impossible. Nor did Holman assert that another individual committed the sexual acts T.M.A. alleged were committed by Holman. See *Bourassa*, 28 Kan. App. 2d at 168. This is also not a case wherein the proffered evidence impeached the credibility of a witness. See *State v. Arrington*, 251 Kan. 747, 750, 840 P.2d 477 (1992). The simple fact that a young girl previously engaged in inappropriate sexual conduct with her sister or another child is not a defense to charges that an adult committed aggravated indecent liberties with the child at a later time.

In the district court, Holman also argued the proffered evidence was relevant to show "an alternate source for T.M.A.'s sexual knowledge." On appeal, however, this claim, while mentioned in passing, is not argued and is, therefore, abandoned. See *Cooke v. Gillespie*, 285 Kan. 748, 758, 176 P.3d 144 (2008) (A point raised incidentally in a brief and not argued there is deemed abandoned.).

Regardless of this procedural hurdle, review of the trial evidence reveals that T.M.A.'s use of sexual terminology was never a disputed material fact. As discussed previously, the trial court clearly advised Holman that both A.A. and T.M.A. could be questioned about the sources of the sexual terminology used by T.M.A. to describe the molestations. Although the district court permitted Holman to develop this testimony, a review of A.A.'s and T.M.A.'s cross-examination by defense counsel reveals no inquiry to either individual was made regarding this subject matter.

During closing argument, defense counsel acknowledged this lack of evidence:

"We don't know where she got this knowledge. We don't know what she was taught at school. I know my son, we—I was horrified when he was seven years old, found out they were doing sex education at school. We don't know what the kids in the neighborhood were talking about. We don't know where she got this

information. . . . We don't know what they're watching on TV. We don't know what influences she has in her life that would cause her to have this knowledge about humping or licking. We don't know."

Defense counsel's remarks appropriately summarized the dearth of evidence relating to the source of T.M.A.'s knowledge of sexual matters. This lack of evidence, however, was not the result of the trial court's ruling denying the admission of the proffered evidence.

In sum, the prior instances of sexual conduct did not have a " ' "legitimate and effective bearing on the decision of the case" ' " or " ' "any tendency in reason to prove" ' " a disputed material fact. *Magallanez*, 290 Kan. at 920. Contrary to Holman's assertion, these prior instances were not integral to his defense that A.A. induced T.M.A. to lie about the molestations. Moreover, a fair reading of A.A.'s and T.M.A.'s testimony shows this issue was not developed by Holman during trial, although the district court specifically allowed Holman to inquire into the origin of T.M.A.'s knowledge of sexual matters. Finally, it is apparent that the source for T.M.A.'s knowledge of sexual matters was not a disputed material fact or integral to Holman's defense.

This court has previously observed that "[t]he district court's determination of whether evidence of prior sexual conduct will be probative of a material issue will not be overturned on appeal if reasonable minds could disagree as to the court's decision. [Citations omitted.]" *Berriozabal*, 291 Kan. at 586. While reasonable minds could disagree with the trial court's ruling, we are persuaded that Holman did not show either of the necessary components of relevancy—materiality and probativeness—as required under K.S.A. 21-3525 and Kansas caselaw. The trial court did not err in excluding the proffered evidence.

### The Trial Court's Limitation on Holman's Cross-examination of T.M.A.

Apart from the trial court's limitation on evidence regarding A.A.'s and T.M.A.'s prior sexual conduct, Holman contends the trial court also impermissibly limited his cross-examination of T.M.A. by sustaining the State's objections to questions about the prosecutor's pretrial preparation of T.M.A.'s testimony. The State

responds that these rulings did not impair Holman's ability to challenge T.M.A.'s credibility or result in prejudice.

Holman alleges the trial errors occurred during a portion of his counsel's cross-examination of T.M.A. when the trial court sustained the State's objections on three separate occasions:

"Q. [Holman's Attorney:] Okay. And when was the last time you spoke to [Prosecutor] Ladner outside of a courtroom?

"A. It was the other day.

"Q. Not that long ago?

"A. No.

"Q. What sort of things did you guys talk about?

"A. About what Dave had did—Dave did and about—and we went over my transcript about when I talked to Detective Story and that stuff.

"Q. So she had you go through things that you've said in the past?

"A. Yes.

"Q. And that was to make sure you got things right?

"A. Yeah.

"MS. LADNER [State Prosecutor]: Objection. That is absolutely improper.

"MS. MCLEMORE [Holman's Attorney]: No.

"THE COURT: Sustained.

"Q. (By Ms. McLemore) Did she tell you why you were going through the transcripts?

"MS. LADNER: Objection.

"A. Yes.

"MS. LADNER: Improper.

"MS. MCLEMORE: Your Honor—

"THE COURT: No. I'll allow that. I think that's already been established. Go ahead.

"Q. (By Ms. McLemore) Okay. So did she tell you why it was that you guys were going through the transcripts?

"A. Yes, because it has been a while since I have talked to Detective Story.

"Q. Okay. And she—did she say she wanted to make sure that what you said today is the same as what you said before?

"A. Yes.

"MS. LADNER: Objection. That is improper.

"THE COURT: Sustained.

"MS. LADNER: And it is—

"MS. MCLEMORE: Your Honor, may we approach?

"THE COURT: No. Jury will disregard the last question and answer.

"Q. (By Ms. McLemore) Well, what did she say?

"MS. LADNER: Objection. Hearsay.

"THE COURT: Sustained.

"MS. MCLEMORE: Your Honor, I think we need to make a record outside the presence of the jury.

"THE COURT: Miss Ladner is not testifying in this case, counsel. Ask your next question."

"The scope of cross-examination is subject to reasonable control by the trial court." *State v. Corbett*, 281 Kan. 294, Syl. ¶ 4, 130 P.3d 1179 (2006); see *State v. Noah*, 284 Kan. 608, 616-17, 162 P.3d 799 (2007) (articulating the test used to determine whether the trial court violated the Confrontation Clause of the Sixth Amendment to the United States Constitution in limiting cross-examination of a complaining witness). "The trial court's decision to limit cross-examination is reviewed using an abuse of discretion standard." *Corbett*, 281 Kan. at 307-08. An abuse of discretion occurs when the action is arbitrary, fanciful, or unreasonable. Discretion is abused only when no reasonable person would have taken the action of the trial court. *State v. Sellers*, 292 Kan. 117, 124, 253 P.3d 20 (2011).

At the outset, review of Holman's claim is made more difficult because of the cursory nature of his argument. Holman does complain about the trial court's rulings, which he asserts prevented the defense from "questioning related to a witness' credibility, a primary subject for cross-examination, which is Mr. Holman's fundamental constitutional right." He then cites to *State v. Atkinson*, 276 Kan. 920, 927, 80 P.3d 1143 (2003), which dealt with a defendant's right to confront witnesses under the Sixth Amendment and § 10 of the Kansas Constitution Bill of Rights. Thus, it appears that Holman is raising a violation of the Confrontation Clause.

Holman then presumes reversible error and does not brief or analyze whether the trial court's limitation on questioning was simply harmless error. A point raised incidentally in a brief and not argued there is deemed abandoned. *Cooke*, 285 Kan. at 758. Holman's cursory arguments convince us that any error in the trial court's rulings was harmless.

As a general matter, T.M.A.'s pretrial meetings with the prosecutor and her preparations for trial testimony were appropriate subject matters for inquiry. Assuming the trial court's specific lim-

itations were error, however, the essential question arises was the error harmless or reversible?

Because Holman claims a constitutional challenge to the admission of evidence, an appellate court applies the federal constitutional harmless error rule. See *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012). That rule generally provides that an "error may be declared harmless where the party benefitting from the error proves beyond a reasonable doubt that the error did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict." *Ward*, 292 Kan. 541, Syl. ¶ 6.

In the specific context of a Confrontation Clause issue which is subject to analysis under the above-stated federal harmless error rule, appellate courts have a specific guideline to follow:

"The correct inquiry is whether, assuming that the damaging potential of the cross-examination was fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, and, of course, the overall strength of the prosecution's case." *State v. Nguyen*, 281 Kan. 702, Syl. ¶ 6, 133 P.3d 1259 (2006).

Applying these standards to the facts of this case convinces us that any error by the trial court was harmless.

T.M.A.'s testimony was important because she was the complaining witness against Holman. Her credibility was critical to the State's case, and Holman's ability to impair her credibility was essential to his defense. Two of the three questions asked by defense counsel and not allowed by the trial court sought out-of-court oral statements made by the prosecutor to T.M.A. On the other hand, the trial court permitted defense counsel to inquire into the purpose and conduct of T.M.A.'s pretrial meetings with the prosecutor. As a result of this cross-examination, the jury was advised that T.M.A. and the prosecutor had met shortly before trial, they had discussed T.M.A.'s molestation allegations, in particular the inter-

view she gave to Detective Story, and they also had jointly reviewed transcripts of T.M.A.'s pretrial statements about the incidents. In regard to the transcripts, the jury was also informed:

"Q. [Holman's Attorney:] Okay. So going over those transcripts, do you think that is helping you remember to say the same thing you said before?
"A. Yes.
"Q. Okay. You don't want to get—you don't want to say something today that you didn't say before?
"A. No."

Defense counsel then reviewed each molestation allegation with T.M.A., comparing and contrasting her testimony at the preliminary hearing with her trial testimony in an effort to impeach her credibility. In this way, the jury was able to evaluate T.M.A.'s credibility and determine if she was unduly influenced by the prosecutor in presenting her testimony.

Moreover, as discussed earlier, T.M.A. had told her sister, her grandmother, her mother, Detective Story, and her therapist about the molestation allegations. She also had testified at the preliminary hearing. Some of these pretrial statements were recorded, others were presented to the jury by the individuals who spoke with T.M.A. Regardless, the jury was fully capable of assessing T.M.A.'s credibility by comparing and contrasting the various pretrial molestation accounts.

In sum, having reviewed the relevant factors set forth in *Nguyen*, 281 Kan. 702, Syl. ¶ 6, including the overall strength of the State's case, we conclude beyond a reasonable doubt that any error did not affect the outcome of the trial in light of the entire record, *i.e.*, there was no reasonable possibility that the error contributed to the verdict. See *Ward*, 292 Kan. 541, Syl. ¶ 6.

### AMENDMENT OF THE SECOND AMENDED INFORMATION

Next, Holman contends the trial court erred in granting the State's motion to amend Count II of the second amended information after the defense rested its case. This amendment expanded the time frame for the commission of the first alleged aggravated indecent liberties with a child offense a total of 18 days—from April

8, 2006, to May 25, 2006, rather than April 1, 2006, to April 30, 2006.

Holman argues the amendment was improper because he relied on the shorter time frame and submitted evidence of his work schedule and records tending to show he was working during the month of April 2006. As a result, Holman asserted he was frequently not at home during the time period when the offenses were allegedly committed. The State contends the trial court did not abuse its discretion in allowing the amendment pursuant to K.S.A. 22-3201(e) because the amendment did not charge an additional crime or prejudice the substantial rights of the defendant.

In the district court, at the conclusion of Holman's case-in-chief the State moved "to amend the dates of the charges to conform with the evidence . . . admitted." Holman objected, claiming the defense had "detrimentally relied upon the time frames" in developing its defense. The State countered that the molestation incidents were well known to the defense and in child sex abuse cases "it is so difficult for a child to place a precise day, date, hour, minute" on when a particular molestation occurred. On appeal, Holman only raises error with regard to Count II. As a result, any claimed errors with regard to the other counts are waived and abandoned. See *McCaslin*, 291 Kan. at 709.

Whether the amendment allowed by the court violated K.S.A. 22-3201(e) is reviewed for an abuse of discretion. See *State v. Bischoff*, 281 Kan. 195, 205, 131 P.3d 531 (2006). "Discretion is abused only when no reasonable person would take the view adopted by the district court. The defendant bears the burden of establishing such an abuse of discretion." 281 Kan. at 205 (citing *State v. Sanchez-Cazares*, 276 Kan. 451, 454, 78 P.3d 55 [2003]).

K.S.A. 22-3201(e) provides: "The court may permit a complaint or information to be amended *at any time* before verdict or finding if no additional or different crime is charged and if substantial rights of the defendant are not prejudiced." (Emphasis added.) See *State v. Ransom*, 288 Kan. 697, 715-16, 207 P.3d 208 (2009); *State v. Matson*, 260 Kan. 366, 370, 921 P.2d 790 (1996). Because the amendment in the present case did not cause an additional or dif-

ferent crime to be charged, the only issue for review is whether the expanded time period prejudiced Holman.

A review of Kansas caselaw shows that certain factors are important to consider in the determination of whether the defendant was prejudiced by the amendment. For example, in *State v. Ferguson*, 221 Kan. 103, 105-06, 558 P.2d 1092 (1976), this court upheld the amendment because "the fact the dates were amended to conform with the evidence is not prejudicial. It was not a critical issue. No statute of limitations was involved. Alibi was not a defense to make dates important. Time was not an element of the offense." See also *State v. Van Cleave*, 239 Kan. 117, 121, 716 P.2d 580 (1986) (allowing amendment because no alibi defense was asserted and the date of the offense was not material to any defense; no prejudice was shown). In particular, with regard to the charge of indecent liberties with a child, this court has specifically held that "[t]ime is not an indispensable ingredient." *State v. Nunn*, 244 Kan. 207, 227, 768 P.2d 268 (1989) (citing *State v. Sisson*, 217 Kan. 475, Syl. ¶ 2, 536 P.2d 1369 [1975]). Finally, this court has noted " 'it is not unusual for uncertainty as to dates to appear particularly where the memories of children are involved.' " *Nunn*, 244 Kan. at 227.

Holman has failed to show prejudice of his substantial rights. At the outset, T.M.A. was only 8 years old when the molestation she alleged occurred and 10 years old at the time of her trial testimony. In her pretrial statements and testimony, she generally spoke of the offense in terms of seasons, stating that the offense occurred when it was both hot and cold outside. T.M.A.'s therapist testified that T.M.A. struggled with concepts of time and with remembering the dates of the incidents. There was also evidence that this first incident of molestation occurred during the spring of 2006. Given T.M.A.'s pretrial statements, preliminary hearing testimony, and direct and cross-examination testimony, Holman was aware that the date of this offense was uncertain. Given this uncertainty, the 18 days added to the original 30-day period in the charging document should not have surprised Holman or compromised his defense. Moreover, this was not a situation that implicated the statute

of limitations or adversely impacted an alibi defense. Accordingly, we find no error in this particular amendment.

Finally, we observe that the better practice is for the State to amend the charging document to conform to the trial evidence at the close of its case-in-chief, whenever possible, rather than at the close of the defendant's case-in-chief, to afford the defense an opportunity to address the amendment in their presentation of evidence without resort to a recess or continuance of the trial, if necessary.

## MULTIPLICITY

Holman contends his convictions for aggravated indecent liberties with a child as charged in Counts IV and V are multiplicitous. These counts related to the incident that occurred while Holman and T.M.A. were watching the movie "Saw" at home during the spring of 2007. With regard to Count IV, T.M.A. testified that during the movie Holman "took my hand and put my hand inside of his pants." Holman then had T.M.A. move her fingers back and forth on his penis. With regard to Count V, T.M.A. testified that Holman "put a blanket over his hand and then put it inside my pants." A.A. testified these two sexual touchings occurred at the same time. Holman was convicted of both counts.

Questions involving multiplicity and statutory interpretation are questions of law subject to unlimited appellate review. *Sellers*, 292 Kan. at 127-28.

Multiplicity is the charging of a single offense in several counts of a complaint or information. The principal danger of multiplicity is that it creates the potential for multiple punishments for a single offense, which is prohibited by the Double Jeopardy Clauses of the Fifth Amendment to the Constitution of the United States and § 10 of the Kansas Constitution Bill of Rights. See *State v. Thompson*, 287 Kan. 238, 244, 200 P.3d 22 (2009).

In *State v. Schoonover*, 281 Kan. 453, 496, 133 P.3d 48 (2006), this court established an analytical framework for determining whether multiple convictions subject a defendant to double jeopardy. The overarching inquiry is whether the convictions are for the same offense. This inquiry is divided into two components,

both of which must be met for there to be a double jeopardy violation: First, do the convictions arise from the same conduct? Second, if so, by statutory definition, are there two offenses or only one? 281 Kan. at 496.

The first component of the multiplicity inquiry requires the court to consider whether the conduct is discrete or unitary. If the conduct is discrete, the convictions do not arise from the same offense and there is no double jeopardy violation. But if the charges arose from the same act or transaction, then the conduct is considered unitary and the court moves to the second component of the inquiry. 281 Kan. at 496.

The court considers the following factors to determine if the convictions arose from the same conduct:

"[S]ome factors to be considered in determining if conduct is unitary, in other words if it is the 'same conduct,' include: (1) whether the acts occur at or near the same time; (2) whether the acts occur at the same location; (3) whether there is a causal relationship between the acts, in particular whether there was an intervening event; and (4) whether there is a fresh impulse motivating some of the conduct." 281 Kan. at 497.

A review of the trial evidence persuades us that the sexual touching Holman had T.M.A. perform on him occurred at or about the same time Holman sexually touched T.M.A. These two sexual touchings also occurred at the same location, and there was no indication of a fresh act or intervening event between the touchings. On appeal, the State concedes the sexual touchings were unitary conduct because they occurred "simultaneously." We agree. Having considered the *Schoonover* factors, we conclude the two touchings constituted one unitary act or transaction.

Applying the second component of the *Schoonover* analysis, we note that because Holman's convictions in Counts IV and V arose from the same statute, K.S.A. 21-3504(a)(3)(A), we next apply the unit of prosecution test.

"If the double jeopardy issue arises because of convictions on multiple counts for violations of a single statute, the test is: How has the legislature defined the scope of conduct which will comprise one violation of the statute? Under this test, the statutory definition of the crime determines what the legislature intended as the allowable unit of prosecution. There can be only one conviction for each allowable

unit of prosecution. The unit of prosecution test applies under either the Double Jeopardy Clause of the Fifth Amendment or § 10 of the Kansas Constitution Bill of Rights." *Schoonover*, 281 Kan. at 497-98.

Holman was convicted of aggravated indecent liberties under K.S.A. 21-3504(a)(3)(A). K.S.A. 21-3504(a)(3) prohibits:

"(3) engaging in any of the following acts with a child who is under 14 years of age:

(A) Any lewd fondling or touching of the person *of either the child or the offender*, done or submitted to with the intent to arouse or to satisfy the sexual desires of either the child or the offender, or both; or

(B) soliciting the child to engage in any lewd fondling or touching of the person of another with the intent to arouse or satisfy the sexual desires of the child, the offender or another." (Emphasis added.)

Subsequent to briefing and oral argument in the present case, this court resolved the legal issue of what constitutes an allowable unit of prosecution as it relates to this specific statute. *State v. Sprung*, 294 Kan. 300, 277 P.3d 1100 (2012). In *Sprung*, this court stated that "[t]he determination of the allowable unit of prosecution is not necessarily dependent upon whether there is a single physical action or a single victim. Instead, the key consideration is the scope of the course of conduct proscribed by the statute." 294 Kan. 300, Syl. ¶ 8. This court then determined:

"K.S.A. 21-3504(a)(3)(A) creates only a single unit of prosecution. Had the legislature intended to create one unit of prosecution when the offender touches the child and a separate unit of prosecution when the child touches the offender, the legislature could have separated subsection (A) into two subsections, *i.e.*, one subsection proscribing any lewd foundling or touching of a child by the offender and one subsection proscribing any lewd fondling or touching of the offender by the child. Instead, the legislature defined aggravated indecent liberties as 'engaging in any of the following acts,' and then provided only two defining subsections, (A) and (B). [Citations omitted.]" 294 Kan. at 310.

Moreover, this court noted that K.S.A. 21-3504(a)(3)(A) set forth "a unifying intent—'to arouse or to satisfy the sexual desires'—with the object of that intent being the child, the offender, or both." 294 Kan. at 310. Finally, assuming the legislature's intent in drafting this legislation was unclear regarding the unit of prosecution, this court concluded "the rule of lenity would mandate that we

construe the statute in favor of the defendant." 294 Kan. at 310-11.

In the present case, the jury convicted Holman of the unitary conduct of lewd touching of T.M.A. and causing T.M.A. to lewdly touch him. Given that K.S.A. 21-3504(a)(3)(A) creates a single unit of prosecution for this conduct, we hold that Holman's convictions for aggravated indecent liberties with a child in Counts IV and V are multiplicitous. Accordingly, we affirm Holman's conviction under Count IV, reverse his conviction under Count V, and vacate the sentence imposed in Count V.

## Claims Pertaining to Holman's Age

Holman asserts two related claims of error regarding his convictions of aggravated indecent liberties with a child in Counts IV and V. The basis for Holman's claims are that the State was required to plead and prove that he was 18 years of age or older as an element of the crimes charged under K.S.A. 21-3504(a)(3)(A) and (c) and for his sentence under K.S.A. 21-4643(a)(1)(C), commonly known as Jessica's Law.

Upon his conviction on Count II, Holman was sentenced under the KSGA to 59 months' imprisonment based upon a severity level 3 person felony. Upon his convictions on Counts IV and V, however, Holman was sentenced under K.S.A. 21-4643(a)(1)(C) to life imprisonment with a mandatory minimum sentence of 25 years on each count. Because this court has reversed Holman's conviction under Count V and vacated the sentence, we are only concerned with Holman's claims as they relate to Count IV.

First, Holman alleges the State's failure to list his age in the second amended information deprived the trial court of jurisdiction to convict and sentence him to life in prison under K.S.A. 21-4643(a)(1)(C). Second, he asserts the trial court's failure to instruct the jury that it must find he was 18 years of age or older at the time of the commission of the crimes violated his rights under the Sixth Amendment to the Constitution of the United States.

Issues implicating subject matter jurisdiction and statutory and constitutional interpretation are subject to unlimited review by an

appellate court. *State v. Martinez*, 290 Kan. 992, 1017, 236 P.3d 481 (2010).

In *State v. Gonzalez*, 289 Kan. 351, 366, 212 P.3d 215 (2009), under a factual scenario similar to the present case, this court held that a defendant who challenged the sufficiency of a charging document for the first time on appeal must establish the alleged defect either prejudiced the defendant's preparation of a defense, impaired the defendant's ability to plead the conviction in a later prosecution, or limited the defendant's substantial rights to a fair trial. 289 Kan. at 368.

On appeal, the State concedes the second amended information did not "expressly allege that defendant was eighteen years of age or older." The second amended information did indicate, however, that Holman was being charged with an off-grid person felony, and his year of birth was stated on the first page of the charging document.

For his part, in the district court Holman did not object to any defect in the second amended information. On appeal, he also makes no showing of prejudice to his defense, impairment of his ability to plead the conviction in a later prosecution, or limitation upon his substantial rights to a fair trial. See 289 Kan. at 368. We find, under the circumstances, that Holman was adequately informed of the charge in Count IV and the possible penalty of life imprisonment. Accordingly, we hold that any deficiency in the charging document did not invalidate Holman's conviction on, or sentence for, Count IV, and we affirm his conviction.

For his second claim, Holman contends the failure of the trial court to instruct on his age and the State's failure to prove to the jury that he was 18 years of age or older at the time of the commission of the offense—a necessary fact to be established under the special sentencing provision of K.S.A. 21-4643(a)(1)(C)—invalidates his enhanced sentence. This argument is predicated on *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000).

On appeal, the State concedes Holman's age was "not mentioned in the jury instructions listing the elements of his offenses." Moreover, the State does not controvert Holman's assertion that it

failed to provide evidence at trial upon which a rational factfinder could conclude Holman was 18 years of age or older.

In *Martinez*, this court reviewed a series of cases wherein the same legal argument was raised under very similar factual situations:

"The second challenge relates to the district court's failure to instruct the jury to determine whether Martinez was 18 years of age or older at the time of the offense. This issue arises from recent decisions involving Jessica's Law in which we held the failure to allege and instruct on the defendant's age was error under *Apprendi*. See *State v. Morningstar*, 289 Kan. 488, 494-95, 213 P.3d 1045 (2009); [*State v.*] *Gonzales*, 289 Kan. [351,] 371[, 212 P.3d 215 (2009)]; [*State v.*] *Bello*, 289 Kan. [191,] 199-200[, 211 P.3d 139 (2009)]. In those cases, the record contained no evidence on which a jury could have based a finding about the defendant's age, even if the jury was properly instructed. Accordingly, we remanded the cases to the district court for resentencing under the [KSGA], rather than under the off-grid sentencing provisions required by Jessica's Law. . . .

"But more recently in *State v. Reyna*, 290 Kan. 667, 234 P.3d 761 (2010), we considered whether the failure to instruct the jury on this element of the crime was harmless when the trial record contained evidence of the defendant's age that would have permitted the jury to make the appropriate finding, if properly instructed to do so. In *Reyna*, we concluded that a harmless error analysis was applicable. 290 Kan. at 682." *Martinez*, 290 Kan. at 1018-19.

See *State v. Brown*, 291 Kan. 646, 662-64, 244 P.3d 267 (2011).

Given the State's concessions and our independent review of the trial record, we conclude the failure to provide the jury with an appropriate instruction and the failure to prove beyond a reasonable doubt to the jury that Holman was 18 years of age or older at the time of the commission of the offense charged in Count IV was not harmless error. Accordingly, the off-grid sentence imposed on Holman under K.S.A. 21-4623(a)(1)(C) is vacated, and the case is remanded for resentencing on Count IV for severity level 3 felony on the KSGA nondrug sentencing grid.

Affirmed in part, reversed in part, vacated in part, and remanded with directions to resentence the defendant on Count IV.

BUSER, J., assigned.

* * *

JOHNSON, J., concurring in part and dissenting in part: I agree with most of the majority's well-written opinion. But I write separately on two matters: (1) the continuing misinterpretation of K.S.A. 60-404; and (2) the limitation on the defense's ability to test the victim's credibility.

First, I continue to disagree with the majority's reliance on K.S.A. 60-404 as the justification for its artificial, court-made preservation rule which requires a defendant to reassert an objection which has previously been ruled upon in favor of the State, *i.e.*, effectively requiring a defendant to seek modification at trial of the court's pretrial orders. See, *e.g.*, *State v. Wright*, 290 Kan. 194, 207-08, 224 P.3d 1159 (2010) (Johnson, J., concurring); *State v. Hollingsworth*, 289 Kan. 1250, 1260-61, 221 P.3d 1122 (2009) (Johnson, J., dissenting). I would only add that, in contrast to the majority's reading of the general rules of evidence in Article 4 of Chapter 60, the Code of Criminal Procedure in Chapter 22 appears to contemplate that matters which can be resolved prior to trial should be handled in that manner.

For instance, in the context of motions to suppress evidence, the Code of Criminal Procedure explicitly lays out the preferred timing. K.S.A. 22-3215(6) provides that a motion to suppress a confession or admission "shall be made before preliminary examination or trial, unless opportunity therefor did not exist or the defendant was not aware of the ground for the motion, but the court in its discretion may entertain the motion at the preliminary examination or the trial." K.S.A. 22-3216(3) states that a motion to suppress illegally seized evidence "shall be made before trial, in the court having jurisdiction to try the case, unless opportunity therefor did not exist or the defendant was not aware of the ground for the motion, but the court in its discretion may entertain the motion at the trial." Moreover, K.S.A. 22-3216(2) directs that the "judge shall receive evidence on any issue of fact necessary to determine the motion." I simply cannot read those provisions as meaning that a judge who elects to exercise his or her discretion to decide a suppression motion before trial must nevertheless re-

peat the process at trial. To the contrary, once a judge rules on a matter, that order should be the law of the case until it is rescinded or modified by the court.

On the second issue of the limitations on cross-examination, I believe that the trial judge's erroneous rulings prevented a full and complete assessment of the victim's credibility in the particular manner required by the Sixth Amendment's Confrontation Clause: "by testing in the crucible of cross-examination." *Crawford v. Washington*, 541 U.S. 36, 61, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). *Crawford* described the right as "a procedural rather than a substantive guarantee." 541 U.S. at 61. The relative importance of that procedure can be seen in the statement that "[d]ispensing with confrontation because testimony is obviously reliable is akin to dispensing with jury trial because a defendant is obviously guilty." 541 U.S. at 62.

Granted, a defendant's constitutional right to cross-examine the prosecuting witness must be subject to such limitations as the trial judge determines are necessary, which could include such reasons as " 'harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.' " *State v. Noah*, 284 Kan. 608, 616, 162 P.3d 799 (2007) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 678-79, 106 S. Ct. 1431, 89 L. Ed. 2d 674 [1986]). Here, however, I do not see the necessity. The only explanation by the trial judge was that the prosecutor was not testifying in this case. But if the prosecutor had told the victim what to say on the stand, then the prosecutor would have, in effect, been "testifying in this case." The victim had already acknowledged that she had a pretrial meeting with the prosecutor at which they reviewed the transcript of the victim's earlier statements to a detective. The defendant was entitled to pursue which part, if any, of the victim's trial testimony was the product of the meeting with the prosecutor, as opposed to the victim's independent recollection of the event.

The majority opines that Holman suffered no prejudice from the limitations placed upon his cross-examination of the victim. The rationale for that conclusion is that the jury learned through other testimony that the victim had met with the prosecutor, re-

viewed her past statements, and discussed her testimony. But the defendant was precluded from exploring the details which could have been important. For instance, if the victim's current recollection of some detail differed from the statement she gave to the detective, did the prosecutor advise the witness on which version she should use at trial?

Moreover, I find a good deal of irony in the majority's declaration that Holman failed to show the requisite prejudice. Prior to that holding, the majority found that the trial court's failure to give a limiting instruction on K.S.A. 60-455 evidence was not clearly erroneous in part because the victim's "trial testimony was fairly consistent with her pretrial accounts provided to her family and Detective Story"—the apparent suggestion being that the victim was highly credible because she said the same things at trial that she had said to the detective, *i.e.*, she told the truth throughout the process. Of course, another explanation might be that the victim studied and discussed with the prosecutor her prior statements with a view to testifying consistently at trial. Nevertheless, the point is that Holman was indeed prejudiced in this very appeal when the majority used the consistency of the victim's testimony as grounds to reject reversal on another issue.

In short, I would find that the district court erred in limiting the defense's cross-examination of the victim as to the full extent of the State's preparation of the witness. The court then exacerbated the error by refusing defense counsel's request to make a record outside the presence of the jury, with the result that we are denied the benefit of a proffer. Under those circumstances, I cannot find that Holman received a fair trial. Without a fair trial, I cannot vote to affirm the conviction. See *State v. Tosh*, 278 Kan. 83, 97, 91 P.3d 1204 (2004) ("Denial of a fair trial violates the due process rights of the guilty defendant just as surely as those of the innocent one.").